# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In Re: Richert Funding, LLC

**ELKHORN GOLDFIELDS, INC.,**
**and PATRICK IMESON,**

                **Appellants,**

v.                                    **Case No: 6:23-cv-02425-PGB**

**SONEET R. KAPILA,**

                **Appellee.**
_____/

## ORDER

This cause comes before the Court without oral argument[1] upon Appellants Elkhorn Goldfields, Inc., and Patrick Imeson's (collectively, the "**Appellants**") opening brief.[2] (Doc. 25). Appellee Soneet Kapila ("**Trustee**") has filed a Response Brief. (Doc. 27). Both the Appellants and Trustee have filed replies. (Docs. 28, 31). After reviewing the record and briefing, the Bankruptcy Court's Final Judgment (Doc. 14-2 (the "**Judgment**")) and Order Denying Motion for Reconsideration

---

[1] Although Trustee requests oral argument in this matter, the Court has examined the briefing and records and finds that "the facts and legal arguments are adequately presented" therein, and the "Court's decisional process would not be significantly aided by oral argument." (Doc. 27, p. 16); *see* FED. R. BANKR. P. 8019(b)(3).

[2] This Order addresses issues raised in both the instant appeal and Trustee's cross-appeal, *Kapila v. Elkhorn Goldfields, Inc. et al*, No. 6:24-cv-00264-PGB (filed Feb. 6, 2024) (the "**cross-appeal**"), for the sake of clarity and efficiency. However, this Order's legal effect is limited to Counts VI, VII, VIII, and IX of the First Amended Complaint (Doc. 14-30), which are the subject of this appeal. The disposition of Counts I, II, III, IV, and V and the application of 28 U.S.C. § 1963 are set forth in the separate Order entered on the docket in the cross-appeal.

and Clarifying That Trustee is not Limited in Other Proceedings (Doc. 9-1 (the "**Order Denying Reconsideration**")) are due to be affirmed in part and reversed in part.

## I.    BACKGROUND[3]

In this appeal, the Appellants challenge the Bankruptcy Court's Judgment as to Counts VI, VII, VIII, and IX of the underlying complaint. (Doc. 25). In his cross-appeal, Trustee challenges the Bankruptcy Court's Judgment with respect to Counts I, II, III, IV, and V of the underlying complaint. (Doc. 14-30). Trustee also challenges the Bankruptcy Court's determination that the Judgment can only be filed in the state courts of Montana and Colorado. (Doc. 9-1, p. 19–20).

### A.    The Parties

Elkhorn Goldfields, Inc. ("**Elkhorn**") is a Montana corporation that owns a mine in the State of Montana. (Doc. 14-154, 7:4). Elkhorn's mine consists of "approximately 800 patented claims and around 2,300 unpatented acres surrounding and surface." (*Id.* 7:17–18). A patent is a property interest in both the surface and underlying minerals. (*Id.* 7:19–20). An unpatented claim gives the holder rights to only the minerals. (*Id.* 7:20–21). Elkhorn's mineral rights were in gold and silver. (*Id.* 7:21–22). Some minerals were "extracted in 2011 or 2012." (*Id.* 8:1). Yet, since then, it's "been a development project, and testing has been the only activity of Elkhorn since the 2011 or 2012 mineral extraction." (*Id.* 8:2–3).  While

---

[3] This account of the record is derived from the transcript of the hearing at which the Bankruptcy Judge issued his oral ruling (Doc. 14-154) and the written Order Denying Reconsideration (Doc. 9-1).

Elkhorn has generated "some revenue", there has been "no notable or consistent source of revenue" in recent years. (*Id.* 8:5–6).

Patrick Imeson ("**Mr. Imeson**") is an individual who has served as the president of Elkhorn since "about 2016 or 2017" until late 2018 (*Id.* 8:8). However, Mr. Imeson has been involved as an investor in Elkhorn for far longer, since "around the year 2000." (*Id.* 7:23–25).

Richert Funding, LLC ("**Debtor**") was in the business of purchasing accounts receivable at a discount from clients, and then "advancing a percentage of the face value of the invoice to the client." (Doc. 9-1, p. 3). The sole owner and operator of Debtor has been personal friends with Mr. Imeson for twenty years. (*Id.* at pp. 3–4). Through this personal relationship, Debtor entered into factoring agreements (the "**factoring agreements**") with both Elkhorn and Mr. Imeson. (*Id.* at p. 5). This continued until Debtor entered bankruptcy, beginning with an involuntary proceeding on October 11, 2018. (*Id.* at p. 3). Debtor was insolvent at the time these agreements were made. (*Id.* at p. 8).

## B.    The Factoring Agreements

In the factoring agreements, Debtor agreed to "purchase invoices that were for *bona fide* existing obligations arising from the sale of Goods in which both title and the risk of loss had passed." (*Id.* at p. 7 (emphasis added)). The underlying debt owed on the invoices was to be "owed by a payor that is not directly, or indirectly, an Affiliate of [Elkhorn or Mr. Imeson] or in any way not an arm-length transaction." (*Id.*).

3

Debtor made twelve transfers totaling $508,715.91 to Mr. Imeson. (*Id.* at p. 8). Mr. Imeson repaid $149,500 on three invoices, while nine invoices remain unpaid. (*Id.*). However, these transfers often lacked formality. Mr. Imeson himself testified that "in practice" when he "had a financial need, he would call [Debtor] and request an advance." (*Id.* at p. 7). Then, Elkhorn or Mr. Imeson would "create an invoice and would email it to [D]ebtor to be factored." (*Id.*). Mr. Imeson would sign "an account purchase addendum that was made part of . . . the Elkhorn Agreement" and "Debtor would advance the money sometimes before the purchase addendum was executed, sometimes after." (*Id.*).

Debtor also made ten transfers totaling $250,200 to Elkhorn. (Doc 14-154, 7:9). Of these transfers, Elkhorn only repaid Debtor $37,500. (*Id.* 7:10). At least three of the invoices pertaining to these transfers were "refreshed" from previous invoices, and did not themselves convey new obligations. (Doc. 9-1, p. 11 n.64). Two of the invoices conveyed *potential* and *unrealized* obligations, not present, existing obligations. (*Id.* at p. 11). Below, the Bankruptcy Court concluded that the remaining transfers conveyed no underlying value because they were 1) for unrealized investments in "a non-operational mine that was not generating revenue," and 2) there was "no realistic possibility that Elkhorn could repay Debtor within the ninety-day timeframe required" for the remaining invoices (*Id.* at p. 12).

Accordingly, in the Judgment, the Bankruptcy Court awarded Trustee the balance of the outstanding transfer amounts to Debtor. Trustee was awarded

4

$386,685.91 on the transfers to Mr. Imeson and $212,700 on the transfers to Elkhorn. (Doc 14-154, 30:19, 31:1).

### C.    Procedural History

The subject bankruptcy proceedings were initiated on October 11, 2018, after creditors of the bankrupt estate filed an involuntary petition under Chapter 7 of the United States Bankruptcy Code. (*Id.* 6:18). The Bankruptcy Court entered an order for relief on October 11, 2018. (*Id.* 6:19). Shortly thereafter, the petitioning creditors moved to convert the Chapter 7 proceedings into Chapter 11 proceedings and appoint a Chapter 11 Trustee. (Doc. 21-3, p. 4). The Bankruptcy Court entered an order granting the motion and subsequently appointed Soneet Kapila as Chapter 11 Trustee. (*Id.*). Thereafter, the Bankruptcy Court consolidated this case with a related bankruptcy case and was converted back to a Chapter 7 proceeding. (*Id.*). The Bankruptcy Court entered an order in the main proceeding directing the Trustee to file any adversary proceedings under Chapter 5 of the United States Bankruptcy Code, and, subsequently, this adversary proceeding began on April 9, 2021. (Doc 14-154, 6:25).

Trustee asserted claims against Elkhorn and Mr. Imeson in its October 11, 2021 amended complaint, seeking to recover the outstanding balance of the net transfer amounts. (Doc. 14-30). In Counts I, II, III, IV, and V, Trustee asserted claims sounding in contract against Elkhorn and Mr. Imeson. In Counts VI, VII, VIII, and IX, Trustee asserted, in the alternative, statutory fraudulent transfers claims. (*Id.*).

## II.    LEGAL STANDARD

This Court has jurisdiction over this appeal from the final order of the Bankruptcy Court pursuant to 28 U.S.C. § 158. In bankruptcy appeals, the district court reviews the bankruptcy court's factual findings for clear error and its resolution of legal questions *de novo. Coady v. D.A.N. Joint Venture III, L.P.*, 588 F.3d 1312, 1315 (11th Cir. 2009) (per curiam).

## III.    DISCUSSION

The parties in this case dispute many of the issues decided by the Bankruptcy Court in the Judgment. (*See generally* Docs. 25, 27). They disagree on the Bankruptcy Court's findings as to the application of state usury statutes, the correct interpretation of choice of law clauses, and the validity of consideration. However, this Court need not wade into these arguments to resolve this appeal.

First, the Bankruptcy Court found for the Trustee as to Counts VI, VII, VIII, and IX (the "**Fraudulent Transfer Claims**"). (Doc. 14-154, 31:16). As is explained *supra*, this Court affirms that finding, as the Bankruptcy Court's supporting findings of fact in the underlying Judgment were not clearly erroneous. Nor did the court err in determining that the Trustee proved, by preponderance of the evidence, the elements of fraudulent conveyance. *In re Berkman*, 517 B.R. 288, 300 (Bankr. M.D. Fla. 2014) ("[O]n a constructive fraudulent transfer claim, the party seeking to avoid the transfer must establish by a preponderance of evidence that the transferor received less than reasonably equivalent value in exchange for the transfer.").

Moreover, the Bankruptcy Court found against Trustee as to Counts I, II, III, IV, and V (the "**Contract Claims**"). Among other reasons, the Bankruptcy Court found against Trustee because recovery under both the contract and fraudulent conveyance theories would constitute double recovery. This Court ultimately agrees. Thus, without deciding the underlying merit of the Contract Claims, this Court affirms the Judgment as to Counts I, II, III, IV, and V.[4]

However, the Bankruptcy Court erred when it required Trustee to file this Judgment in Montana or Colorado state court. As is explained in more detail below, Congress granted the federal courts no discretion to *ex-ante* determine where their judgments are valid or may be filed. 28 U.S.C. § 1963.

### A.    Fraudulent Transfer Claims[5]

To prevail on its claims for constructively fraudulent transfers, Trustee was required to prove at trial by a preponderance of the evidence that it received 1) "less than reasonably equivalent value in exchange for such transfer or obligation" ("**Prong One**"), and 2) that it "was insolvent on the date that such transfer was made" ("**Prong Two**"). 11 U.S.C. § 548(a)(1)(B); *In re XYZ Options, Inc.*, 154 F.3d

---

[4]  While leaving undecided many contested issues, this Court refrains from opining on issues unnecessary to the final result. This Court affirms on the narrowest grounds necessary. *United States v. Files*, 63 F.4th 920, 933 (11th Cir. 2023) (Newsom, J., Concurring) ("[I]ssuing alternative holdings is often just a bad idea.").

[5]  The Court emphasizes that Trustee's claim is for *constructive* fraudulent transfers. Importantly, the elements for constructive fraud under 11 U.S.C. § 548 require no showing of an intent to defraud. As one court noted, "[g]iven the intent-neutrality of the statutory elements, it is a misnomer and unnecessarily inflammatory to tag such transactions with the word 'fraudulent.' Nonetheless, the title of § 548 does so." *In re Northgate Comput. Sys., Inc.*, 240 B.R. 328, 365 (Bankr. D. Minn. 1999).

1262, 1275 (11th Cir. 1998). The Bankruptcy Court did not err when it determined that Trustee had met this burden.[6]

### i.    Prong One: Reasonably Equivalent Value

Generally, the reasonably equivalent value inquiry "requires a comparison of the value of what went out with the value of what was received." *In re Grabill Corp.*, 121 B.R. 983, 994 (Bankr. N.D. Ill. 1990) (citing *In re Nacol,* 36 B.R. 566, 568 (Bankr. M.D. Fla. 1983)). Reasonably equivalent value "ordinarily [carries] a meaning similar to fair market value." *In re Caribbean Fuels Am., Inc,* 688 F. App'x 890, 895 (11th Cir. 2017)[7] (citing *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 545 (1994)). Through this fact-intensive inquiry, the court aims "to protect creditors against the depletion of a bankrupt's estate." *In re White*, 144 F.4th 1216, 1229 (10th Cir. 2025); *see also In re Rodriguez*, 895 F.2d 725, 727 (11th Cir. 1990). Because this determination is "largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts," bankruptcy courts are "entitled to find that the benefits of the transaction were not reasonably equivalent in value

---

[6]   Trustee's complaint also cites the Florida analogue to 11 U.S.C. § 548, and the Florida statute directly mirrors the requirements of the federal act. *See* Fla. Stat. § 726.105(1)(b) (requiring a claimant to prove a transfer was made "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation" and "[t]he debtor was insolvent . . . after the transfer was made."). Therefore, the Court's legal analysis applies to both statutes. *See In re Seaway Int'l Transp., Inc.*, 341 B.R. 333, 334 (Bankr. S.D. Fla. 2006) (determining that "the state fraudulent transfer provisions [found in Florida Statute § 726.105] are otherwise identical to those found in the bankruptcy code [at 11 U.S.C. § 548], and the trustee's claims under both sections may be analyzed simultaneously."). Importantly, "[t]he only material difference between the state and bankruptcy provisions is the favorable four-year look-back period under the Florida law." *In re Pearlman*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014).

[7]   "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007).

to what the [Debtor] surrendered" absent clear error. *In re TOUSA, Inc.*, 680 F.3d 1298, 1311 (11th Cir. 2012) (citations omitted).

In conducting the reasonably equivalent value inquiry, courts engaged in an open-ended analysis, and consider all factors bearing relevance in the marketplace. *In re Sun Valley Prods., Inc.*, 328 B.R. 147, 156 (Bankr. D.N.D. 2005); *see also In re Northgate Comput. Sys., Inc.*, 240 B.R. 328, 365 (Bankr. D. Minn. 1999) ("The inquiry on this element is fundamentally one of common sense, measured against market reality."). Relevant factors include whether there was good faith between the parties, the difference between the amount paid by debtor and the fair market value of what was received, and whether the transaction was at an arm's length. *In re Morris Commc'ns NC, Inc.*, 914 F.2d 458, 467 (4th Cir. 1990). While the bankruptcy court should consider the objective value of what the debtor received, "[t]he concept of reasonably equivalent value does not require a dollar-for-dollar transaction.*" In re Northlake Foods, Inc.*, 715 F.3d 1251, 1257 (11th Cir. 2013).

Here, the Bankruptcy Court properly evaluated invoices transferred from Elkhorn and Mr. Imeson to Debtor. First, the Bankruptcy Court determined that the transactions did not occur at arm's length. (Doc. 9-1, p. 8). There is no indication that this finding was manifestly erroneous. Mr. Imeson and the sole owner of Debtor have been personal friends for over twenty years. (*Id.* at pp. 3–4). The transfers, both from Elkhorn and Mr. Imeson, often lacked the formality common with disinterested business transactions. Mr. Imeson himself testified that "in practice" when he "had a financial need, he would call [Debtor] and request

an advance . . . Debtor would advance the money sometimes before the purchase addendum was executed, sometimes after." (*Id.* at p. 7). In fact, many of the invoices transferred to Debtor actually represented money owed from affiliates of Elkhorn or Mr. Imeson. (*Id.* at pp. 7–8). Debtor and Mr. Imeson "were speaking several times a day" when it became clear Debtor "was under pressure to collect significant amounts owed to Debtor." (*Id.* at p. 10). On this record, the Bankruptcy Court determined that the transactions were not at arm's length. This Court agrees.

Next, the Bankruptcy Court weighed the market value of the invoices and determined that they were valueless. (*Id.* at p. 19). Importantly, different invoices were valueless for different reasons. At least two invoices represented obligations owed to Black Diamond Gold Inc., a company formed "solely to raise money" for Mr. Imeson's other business endeavors (*Id.* at p. 11). As Mr. Imeson himself testified, some of the obligations were "for potential, unrealized investment funds . . . not presenting an existing obligation." (*Id.*). The Bankruptcy Court credited Trustee's testimony that these invoices represented a mere "expectation that someone will invest in that client at a later date" which was, at best, a "pretty soft asset." (*Id.*). Ultimately, the invoices from Elkhorn had "no underlying value because they were for prospective investments in a non-operational mine that was

not generating revenue . . . ." (*Id.* at p. 12).[8] Another invoice represented money that Farmers Insurance owed to Mr. Imeson, yet Mr. Imeson never sent the invoice to the insurance company. (*Id.* at p. 9). In fact, despite receiving payment from the insurance company, Mr. Imeson transferred none of it to Debtor. (*Id.*). Mr. Imeson claims that several of the invoices were "offset" by commissioned work he completed on behalf of Debtor. (Doc. 25, p. 35). However, the Bankruptcy Court found no evidence of "corroborating business records or other evidence reflecting the terms of any commission agreement between [Mr.] Imeson and Debtor, nor any accounting of the amounts allegedly owed to [Mr.] Imeson." (Doc. 9-1, p. 8).[9] Accordingly, this substantial record supports the Bankruptcy Court's conclusion that the transfers had no underlying value.

---

[8]  Speculative investments are not inherently valueless for § 548 purposes. *In re Chomakos* presents an apt illustration of the line between valuable and valueless speculation. 69 F.3d 769 (6th Cir. 1995) In *Chomakos*, a trustee sought to recover, as fraudulent transfers, prepetition gambling losses. *Id.* The Sixth Circuit grappled with whether debtors receive "reasonably equivalent value" for their bets. *Id.* In determining that casino gambling is "for reasonably equivalent value," the Sixth Circuit reasoned that casino transactions are at arm's length, deeply regulated by the government, exist in an open competitive marketplace, and "the house advantage is only one percent or less." *Id.* at 771. At its heart, casino gambling is for value because its patrons are "engaging in a legal and legitimate pursuit." *Id.* at 772. The record evidence shows that Mr. Imeson and Elkhorn's transactions with Debtor were not at arm's length, lack the rationale of a sophisticated market actor, and the chances of a return on investment were far worse than at the poker table.

[9]  The Court also notes that several of the contested invoices were "refreshed" or mere duplicates of existing obligations. (Doc. 9-1, p. 6). The Bankruptcy Court was correct to disregard claims as applied to the duplicated invoices.

The Court finds that no rational market actor would have paid $758,915.91 for the subject invoices.[10] Instead, the record reflects that Mr. Imeson leveraged his friendship with Debtor's owner to acquire sweetheart deals. Mr. Imeson and his company sold to Debtor instruments that were, most charitably, *extraordinarily* unlikely to result in a profit. At trial, the Bankruptcy Court unraveled the various accounting tricks and dishonest factoring to uncover the true nature of these transfers. On this record, the Bankruptcy Court did not manifestly err in finding the invoices valueless.

### ii.    Prong Two: Insolvency

The Bankruptcy Court's determination "that [D]ebtor was insolvent on the dates of the transfers" was primarily based upon the Trustee's expert opinion. (Doc. 9-1, p. 12). Appellant argues that Trustee 1) was not qualified to offer an opinion on insolvency, and 2) the testimony offered was insufficient to support a finding of insolvency. The Court rejects both of those arguments.

The Bankruptcy Court's decision to admit Trustee's expert testimony is owed great deference. *See United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) ("We review for abuse of discretion the [lower] court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion."). Of

---

[10]    It could be argued that because Mr. Imeson and Elkhorn "repaid or returned" $187,000, the invoices were for a reasonably equivalent value. However, this argument is unpersuasive, as the quantum of value is determined at the time of transfer. *In re Morris Commc'ns NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990) ("The critical time is when the transfer is 'made'. Neither subsequent depreciation in nor appreciation in value of the consideration affects the value question whether reasonable equivalent value was given." (quoting *Collier on Bankruptcy,* § 548.09 at p. 116 (15th Ed. 1984)). Accordingly, subsequent repayments by Mr. Imeson or Elkhorn are irrelevant to the determination of value at the time of transfer.

course, "there will be occasions in which we affirm the [lower] court even though we would have gone the other way had it been our call." *Id.* at 1259 (internal citations omitted). Here, the Bankruptcy Court properly inquired into Trustee's credentials, experience, and knowledge. (Doc. 14-151, pp. 78–88). While this was not a formal *Daubert* hearing, the *voir dire* provided a sufficient basis to qualify Trustee as an expert. *United States v. Ware*, 69 F.4th 830, 845 (11th Cir. 2023) ("We also review the denial of a *Daubert* hearing only for abuse of discretion."). This broad discretion allows lower courts, who "are much more intimately familiar with the individual facts and needs of a particular case, to manage their dockets and counsels' time to provide the most efficient and just resolution of issues." *Id.* at 846.

Following direct examination, Appellants' counsel had an opportunity to question Trustee before he was admitted as an expert. Rather than ask Trustee about his qualifications, subject-matter expertise, or experience, Appellants' counsel attempted to impeach and dispute Trustee's opinion. (Doc. 14-151, pp. 82–88). After the Bankruptcy Court sustained counsel for Trustee's objection to this line of questioning, Appellants' counsel had no further questions for the Trustee. (*Id.* at p. 88). Accordingly, the record provides no basis to conclude that the Bankruptcy Court's decision to qualify Trustee was "manifestly erroneous." *Ware*, 69 F.4th at 845.

Appellant also argues that, because Trustee was admitted to testify on *insolvency* and not *valuation*, he cannot opine on valuation. However, courts

interpret the qualification requirement of Federal Rule of Evidence 702 liberally. *See United States v. Ramsey,* 165 F.3d 980, 984 (D.C. Cir. 1999). Inherent to an analysis of insolvency is the valuation of assets and liabilities because, to form his opinion on insolvency, Trustee had to value the Debtor's assets and liabilities. Accordingly, even following a rigid application of the qualification requirement of Federal Rule of Evidence 702, valuation is inherent to insolvency and Trustee was qualified to testify as to either.

Appellants also object to Trustee's testimony on the grounds that he did not review some of the underlying invoices at issue. (Doc. 25, p. 15). However, the "objections to the inadequacies of a[n expert's opinion] are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) (citing *Cummings v. Standard Register Co.*, 265 F.3d 56, 65 (1st Cir. 2002)) ("[W]hatever shortcomings existed in [the expert's] calculations went to the weight, not the admissibility, of the testimony."). Essentially, Appellants' argument is an objection to the weight that the Bankruptcy Court afforded Trustee's testimony. The "choice of whom to believe is conclusive on the appellate court unless the judge credits *exceedingly* improbable testimony . . . In other words, [w]e must accept the evidence unless it is contrary to the laws of nature . . . ." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (citations omitted). Trustee's testimony was rational, insightful to the trier of fact,

and based upon adequate credentials. Thus the Bankruptcy Court did not err in relying on his testimony to determine insolvency.[11], [12]

## B.    The Contract Claims

In his cross-appeal, Trustee argues that the Bankruptcy Court erred by rejecting the breach of contract claims. (Doc. 27, p. 19). However, because Trustee succeeded on the Fraudulent Conveyance Claims, the threshold issue is whether simultaneous recovery under both the Contract Claims and Fraudulent Conveyance Claims is possible. Even assuming *arguendo* that the Bankruptcy Court erred by rejecting the breach of contract action, for the reasons explained below, double recovery is not permitted.

If there were valid contracts that Mr. Imeson and Elkhorn had breached, Trustee would have recovered restitution damages. In his complaint, Trustee specifically pleads unjust enrichment in the alternative to each count of breach of contract. (Doc. 14-30, pp. 11–12). Thus, it is implied that Trustee sought restitution. *See Associated Mgmt. Servs., Inc. v. Ruff*, 424 P.3d 571, 594 (Mont.

---

[11]   Moreover, it was not necessary for Trustee to review each individual invoice to determine insolvency. To determine "whether a firm is insolvent within the meaning of § 548(a)(2)(B)(i), a court should ask: What would a buyer be willing to pay for the debtor's entire package of assets and liabilities? If the price is positive, the firm is solvent; if negative, insolvent." *Covey v. Com. Nat. Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992). To answer that question, must an expert witness review the contracts and documents acquiring or creating each of the debtor's assets? This Court thinks not. The record shows that Trustee was aware of the Debtor's assets and liabilities, even if he did not review the underlying documents creating each asset or liability.

[12]   The Court also notes that the Appellant did not offer their own expert on insolvency at trial. While the Bankruptcy Court would still enjoy the same deference to weigh the evidence regardless, it is difficult to say that the court erred in relying on the *only* insolvency witness presented. This Court will not act as Appellants' expert and conduct an independent analysis of Debtor's assets to undermine Trustee's testimony.

2018) ("Unjust enrichment is an equitable claim for restitution"); *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) ("Unjust enrichment is based on principles commonly associated with restitution."); *Sauner v. Pub. Serv. Auth. of S.C.*, 581 S.E.2d 161, 167 (S.C. 2003) ("Restitution is a remedy designed to prevent unjust enrichment."); *Ala v. Chesser*, 5 So. 3d 715, 718 (Fla. 1st DCA 2009) ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other.").[13]

Moreover, it is an ancient principle of the law of contracts that a plaintiff may not recover twice for the same injury. D. Dobbs, *Law of Remedies: Damages, Equity, Restitution*, § 9.3 at 740 (3d Ed. 2018) (A plaintiff cannot "obtain damages for fraud and also rescind and get his money back. He cannot have his cake and eat it too."); *see also Hickson Corp. v. Norfolk S. Ry. Co.*, 260 F.3d 559, 567 (6th Cir. 2001). Fundamentally, Trustee is seeking to "claw back" the money transferred by the bankruptcy estate to Mr. Imeson and Elkhorn. Because Trustee was already awarded full restitution of the net transfer amounts, permitting a second award of restitution under the Contract Claims would be textbook double recovery.

Trustee disputes this characterization and argues that the causes of action are distinct, thus recovery on both theories would not offend the principle against double recovery. (Doc. 27, p. 59). Trustee primarily relies on *In re EBC I, Inc.*, and

---

[13]  The Court surveys the law of each potentially governing state to confirm that restitution is the proper remedy for unjust enrichment. Thus, the Court need not determine which state's law properly applies to the contracts to deem restitution as the contractual remedy that would have been awarded.

*In re Friedman's, Inc.*, for this proposition. 356 B.R. 631 (Bankr. D. Del. 2006); 372 B.R. 530 (Bankr. S.D. Ga. 2007).

Trustee misreads *In re EBC I, Inc.* There, the court merely held that a "transfer may be fraudulent even if it is made in accordance with the terms of a contract between the parties" for § 548 purposes. 356 B.R. at 640. The court's opinion principally confirmed that a valid contract could nevertheless constitute a fraudulent transfer if the "requirements of [§] 548 are met." *Id.* at 641. Accordingly, *In re EBC I, Inc.*, is inapposite to the instant case.

Next, Trustee asserts that *In re Friedman's, Inc.*, permits plaintiffs to *plead* both breach of contract and fraudulent conveyance. (Doc. 27, p. 57 n.54). While this is true, Trustee overreads this case to also permit *recovery* under both theories. The court simply clarified that "the fact that a fraudulent conveyance claim may arise out of a common set of facts in which the elements of a breach of contract claim might also exist does not prevent the Trustee from ***pleading*** both claims in his complaint." 372 B.R. 530, 546 (Bankr. S.D. Ga. 2007) (emphasis added). The court simply "permitted [Trustee] to pursue alternative theories." *Id.* The only reason the court even clarified that "the elements of and defenses to a breach of contract action and a fraudulent conveyance action are different" was to resolve the "argument that the Trustee is manufacturing bankruptcy jurisdiction." *Id.* This case merely presents an example of a trustee pleading breach of contract and fraudulent conveyance in the alternative. It does not permit double recovery.

Yet, even if the Court granted relief to Trustee under the Contract Claims, recovery under § 548 would be statutorily barred. Once a court determines that "transfers are avoidable under Bankruptcy Code § 548 or under Florida Statute § 726.105, the Court must then look to Bankruptcy Code § 550 to determine the liability of the transferee of the avoided transfer." *In re McCarn's Allstate Fin., Inc.*, 326 B.R. 843, 852 (Bankr. M.D. Fla. 2005) (cleaned up). Importantly, § 550 prescribes the procedure to recover transfers avoided under § 548. 11 U.S.C. § 550(a). Crucially, a "trustee is entitled to only a single satisfaction under [§ 548]." 11 U.S.C. § 550(d); *see also In re Pearlman*, 515 B.R. 887, 898 (Bankr. M.D. Fla. 2014) ("§ 550(d)'s primary aim is to prevent the estate from receiving a windfall."). Thus, even if the Bankruptcy Court had awarded restitution under the Contract Claims, the Court would be statutorily required to reject the Fraudulent Conveyance Claims.

Accordingly, because the estate has been awarded full restitution under its § 548 claim, a ruling in its favor on the Contract Claims would not entitle it to any additional relief. On these grounds, this Court affirms the Judgment without reaching the merits of the Contract Claims.

## C.    Enforcement of the Judgment

The Bankruptcy Court erred when it prohibited the Trustee from registering its final Judgment in the federal courts. That limitation is *ultra vires* and must be vacated. It directly violates Congress's clear instruction that "**any judgment in**

**whole or in part may be registered** . . . **in any district** . . . .” 28 U.S.C.

§1963.[14] The plain text of 28 U.S.C. § 1963 supplies the rule:

> A judgment in an action for the recovery of money or property entered in any . . . bankruptcy court . . . **. may be registered by filing a certified copy of the judgment in any other district** . . . when the judgment has become final by appeal or expiration of the time for appeal or when ordered by the court that entered the judgment for good cause shown . . . . A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner. A certified copy of the satisfaction of **any judgment in whole or in part may be registered in like manner in any district in which the judgment is a lien**.

§ 1963 (emphases added).

Applying expressly to the judgments of bankruptcy courts, the statute is a vehicle for litigants to enforce their judgments nationwide. *See* § 1963. Congress’s purpose was to facilitate the execution of judgments by eliminating the need to relitigate or file a separate suit. *Hanes Supply Co. v. Valley Evaporating Co.*, 261 F.2d 29, 30 (5th Cir. 1958).[15] As a matter of plain meaning, the twice-used phrase “may be registered” gives the *judgment creditor* the option to register but leaves *no discretion* for either the judgment-issuing court, or the registering court, to

---

[14]   The Court notes that “in any district” is qualified by “in which the judgment is a lien.” 28 U.S.C. § 1963. The effect of a federal judgment includes its lien status, as defined by 28 U.S.C. § 1962, which provides “[e]very judgment rendered by a district court within a State shall be a lien on the property located in such State in the same manner, to the same extent and under the same conditions as a judgment of a court of general jurisdiction in such State . . . .” Courts interpret these statutes together; when a judgment is registered pursuant to § 1963, it acquires the same lien status under § 1962 as would a locally entered federal judgment.

[15]   The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

refuse. § 1963. Once the creditor files the proper certified copy, the clerk's duty is ministerial, and registration must be accepted. *In re Pro. Air Traffic Controllers Org.*, 699 F.2d 539, 544 (D.C. Cir. 1983) ("Registration is a rapid procedure that does not require the intervention of a judge. It is simply a matter of having the clerk of the court [in which the judgment is registered] enter the pertinent provisions of the . . . [sister court's] judgment on the judgment docket" (internal quotations omitted)); *Stanford v. Utley*, 341 F.2d 265, 269 (8th Cir. 1965) ("Registration is purely a ministerial act in the enforcement of a foreign judgment." (internal citations omitted)). By the statute's terms, no court, judgment-issuing or judgment-registering, can impose a restriction limiting the registration of a valid judgment. *See* § 1963.

The Bankruptcy Court found that 28 U.S.C. § 1963 merely "deals with registration of judgments." (Doc. 9-1, p. 19). The Bankruptcy Court is correct but misunderstands that the *consequence* of registration is to give the judgment "the same effect as a judgment of the district court of the district where registered and may be enforced in like manner." § 1963. The only determination afforded to federal courts in the enforcement process is when to apply state law. Federal courts must adhere to the "procedure on execution [in] accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." FED. R. CIV. P. 69. Yet, this does not permit the judgment-issuing court to limit the judgment creditor's statutory right to seek enforcement in other federal

courts.[16] The Bankruptcy Court thus erred, as it ignored Congress's clear instructions by imposing a limitation on Trustee's ability to register the Judgment in the federal courts.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.    The Bankruptcy Court's Final Judgment (Doc. 14-2) and Order Denying Motion for Reconsideration and Clarifying That Trustee is not Limited in Other Proceedings (Doc. 9-1) are **AFFIRMED** as to Counts VI, VII, VIII, and IX;

2.    The appeal is **DISMISSED**; and

3.    The Clerk of Court is **DIRECTED** to close the case.

**DONE AND ORDERED** in Orlando, Florida on September 29, 2025.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

---

[16]    Of course, if Trustee were to seek enforcement of the Judgment here in the Middle District of Florida, it may be impossible to enforce against Appellants in Colorado and Montana. While it might be a better idea to file this Judgment in the courts of Colorado and Montana, the bankruptcy court cannot "require[] Trustee to proceed where Defendants or their assets are located." (Doc. 9-1, p. 19). Nor can the bankruptcy court *ex-ante* prohibit the Trustee from filing his Judgment in *any* federal court. *See* § 1963.